## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**DUANE KING,**<br><br>**Defendant.** | **Case No. 23-CR-319 (APM)** |

### UNITED STATES' MOTION FOR A DOWNWARD DEPARTURE
### AND MEMORANDUM IN AID OF SENTENCING

Duane King is not a hardened criminal who peddled drugs or guns to public school kids in the District. But he did steal from them for years. He also stole from the D.C. Fire and Emergency Services Department. And when the FBI came knocking on his door, he tried to cover his tracks by destroying text messages demonstrating his guilt. Notwithstanding this initial obstruction, the defendant started cooperating with the government's investigation almost immediately. Over the course of multiple debriefings, the defendant described that he had been paying bribes to at least five public officials who worked at various DC government agencies. Three of those public officials pleaded guilty. A fourth, Dana Garnett, was convicted by a jury following a trial during which the defendant testified. Based on his substantial assistance, the government requests the Court reduce King's final offense level by 11 levels, resulting in a final U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range of 12 to 18 months of imprisonment. Consistent with that Guidelines range, the government recommends a sentence of 12 months of incarceration followed by three years of supervised release. Such a sentence appropriately balances the 18 U.S.C. § 3553(a) factors and is sufficient but not greater than necessary to accomplish the goals of sentencing.

1

## BACKGROUND

### A.      The Offense Conduct

The defendant opened American Business Supplies ("ABS") in approximately 2010. *See* Presentence Investigation Report ("PSR") ¶ 104. ABS supplied office goods and supplies to various D.C. government agencies. Beginning in 2016, the Defendant began paying bribes to Joey Mitchell and Charity Keys, two employees with the D.C. Fire Department. The scheme perpetrated by Keys, Mitchell, and King came to light when a Lieutenant with the Fire Department noticed that certain paper goods were in short supply. The shortage did not make sense, however, because the supply order paperwork showed that the Fire Department had ordered and paid for a surplus of paper goods. So where did all the paper go? That question led to the FBI's investigation, which uncovered the short-shipping scheme perpetrated by Keys, Mitchell, and King.

As part of the investigation, the FBI obtained a search warrant for King's cell phone. Before they could execute the warrant, however, the defendant learned the FBI wanted to speak with him. Although he eventually cooperated, King's first instinct was to delete evidence of his misdeeds. He immediately started deleting his text messages with Keys and Mitchell. When he finally came clean with the FBI, he admitted that he had deleted his text messages to cover his tracks. King eventually pleaded guilty to committing fraud and paying kickbacks to Keys and Mitchell.

During his debrief sessions, King also admitted that he been paying kickbacks to other D.C. agency employees. In particular, King confessed that he had been committing fraud in a similar manner with two D.C. Public School ("DCPS") employees: Dana Garnett, a contract specialist at the Central Office, and Patricia Bailey, the business manager at Cardozo High School. As King explained, the scheme with Garnett and Bailey worked similarly to the one involving Mitchell and Keys. Specifically, Garnett and Bailey awarded purchase orders to King, provided non-public bid

information for DCPS contracts, and used a DCPS purchase card to make fraudulent purchases. Typically, the DCPS orders had been inflated, that is, Garnett and Bailey coordinated with King to create fraudulent paperwork that listed a higher number of goods than King actually delivered. Notwithstanding that he did not deliver the full amount of goods, Garnett and Bailey ensured DCPS paid the full amount of the order. King then split the overpayment with Garnett and Bailey. Sometimes, Garnett, Bailey, and King completely fabricated paperwork, submitting fake orders on which King did not deliver any goods at all.

### B.     King Pleads Guilty and Testifies at Trial

As noted above, King eventually pled guilty pursuant to a cooperation plea agreement. *See* GX 701. As part of his plea agreement, the defendant admitted that he had personally received $61,250 in ill-gotten gains as part of the DC Fire Department scheme. He also admitted that he caused a loss of at least $250,000 to the D.C. government. Based in part on King's cooperation, the FBI obtained search warrants for the phones of Mitchell, Keys, Garnett, and Bailey. Mitchell, Keys, and Bailey each pleaded guilty shortly after the FBI approached them. Garnett, however, refused to accept responsibility and insisted on taking her case to the jury.

King testified during Garnett's trial and explained how Garnett had hatched the scheme and introduced him to Bailey. King also explained various text messages to the jury. In one text exchange, King told Bailey that he had left bribe money in her mailbox. In another message, King instructed his associate, Charles Ongele, to pay Garnett a $3,000 kickback. The jury also heard evidence of another exchange in which King described how Garnett had provided King non-public information about a bid. The jury credited King's testimony, as the jury found Garnett guilty of all counts involving King.

### C.     The Sentencing Guidelines

3

Consistent with the parties' plea agreement, the PSR calculated the Guidelines as follows:

| | |
|---|---:|
| Base Offense Level, U.S.S.G. § 2C1.1(a)(1) | 12 |
| Specific Offense Characteristics | |
| More than One Bribe, § 2C1.1(b)(2) | +2 |
| Loss Amount between $250,000 and $550,000 | |
| § 2B1.1(b)(2)(A)(iii) | +12 |
| Obstruction, § 3C1.1 | +2 |
| Acceptance of Responsibility | -3 |
| **Total Offense Level** | **25** |

Based on a Criminal History Category I, the defendant's estimated Guidelines range listed in the plea agreement was 57 to 71 months of incarceration. After the defendant pleaded guilty, however, the U.S. Sentencing Commission passed an amendment that provided an additional 2-level downward adjustment for individuals with zero criminal history points. *See* PSR ¶ 63; *see also* U.S.S.G. § 4C1.1(a)(1)-(10). Accordingly, the defendant's revised Total Offense Level should be 23, with a corresponding Guidelines range of 46-57 months of incarceration. *See* PSR ¶ 125.

## ARGUMENT

In light of the gravity of the offense, the Court should impose 18 months of incarceration followed by three years of supervised release.

### A.     Applicable Sentencing Framework

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Although the Guidelines are advisory, they are nevertheless "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions." *Id*. at 49. Accordingly, they are the "starting point and the initial benchmark" for sentencing. *Id*. The government agrees that the PSR correctly calculates the estimated Guidelines range to be 46 to 57 months of incarceration.

After calculating the applicable Guidelines range, the Court must then consider the applicable factors set forth in 18 U.S.C. § 3553(a). The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the Guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a)(1)-(7).

### B.    Defendant's Substantial Assistance

The government seeks a downward departure under § 5K1.1 of the Guidelines based on the defendant's substantial assistance. Although he regrettably took steps to destroy evidence at first, to his credit, he accepted responsibility shortly after and agreed to cooperate and provide truthful information to the government. Most importantly, King was the first defendant to cooperate with the government. Time is often of the essence in white-collar investigations, as paper trails and text message threads are easy to sweep away with the punch of a button on a shredder. *See* U.S.S.G. § 5K1.1(a)(5) (timeliness). And King's assistance was critically important. *See* U.S.S.G. § 5K1.1(a)(5) (usefulness of cooperation). Indeed, the information King provided led to the convictions of at least 4 other individuals. As one of the only witnesses with a front-row seat

to the fraud scheme orchestrated by Garnett, King was a key witness at Garnett's trial. *See* U.S.S.G. § 5K1.1(a)(3) (nature and extent of cooperation). Finally, King met with the government multiple times, giving the government ample time to probe the credibility of his information and the reliability of his potential testimony. The jury likewise observed King's testimony and credited it. *See* U.S.S.G. § 5K1.1(a)(2) (truthfulness and reliability of information). Given King's extensive and continuing cooperation, the government recommends the Court grant an 8-level downward departure, which results in an offense level of 15. Such a downward departure represents a significant decrease—approximately sixty percent—in King's Guidelines range, which at level 15 would be calculated to be 18 to 24 months.

### C.    The § 3553(a) Factors

Duane King fabricated purchase orders and invoices so that he and his co-conspirators could steal money from D.C. Public School kids and the D.C. Fire Department. To be sure, King eventually accepted responsibility and cooperated, conduct that is noteworthy and commendable. But that was not before he tried to thwart the investigation by destroying evidence. Although King did not succeed in covering up his and his co-conspirators' conduct, he should not be rewarded for his obstruction with a slap on the wrist. The government submits that an 18-month sentence appropriately balances the § 3553(a) factors.

#### 1. The Nature and Circumstances of the Offense

First, the nature and circumstances of the offense justify a period of incarceration in these circumstances. As a product of the D.C. Public School system himself, the defendant surely understood that public school children in D.C. are among the most vulnerable and underserved populations in the District. Likewise, as someone who previously worked at the Metropolitan Police Department, the defendant knew that D.C. Fire and Emergency Services provide life-saving

resources throughout the District. By stealing from these agencies, the defendant furnished a handsome lifestyle for himself. His conduct was serious and warrants incarceration. Absent his cooperation, the government would have asked for a substantially higher sentence than eighteen months to reflect the seriousness of his conduct.

**2. The Need for Deterrence and to Promote Respect for the Law**

Second, the Court's sentence must also promote the rule of law, provide just punishment, and provide adequate deterrence. Sending a strong message is especially important in white-collar cases involving the public fisc. Along with white-collar crime, public corruption cases are "prime candidates for general deterrence" because they often are "more rational, cool, and calculated than sudden crimes of passion or opportunity." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citations omitted). As this case demonstrates, grift in the government procurement space is unfortunately all too common. Many vendors doing business with government agencies consider paying bribes and kickbacks to be a cost of doing business. And many public officials believe that they are entitled to skim a little off the top. This Court should send a strong message to other vendors doing business with government agencies that the consequences of ripping off the taxpayers of D.C. are serious.  A period of incarceration would accomplish that goal.

Moreover, the defendant is himself a young man. Although he will likely be debarred from transacting business with D.C. government agencies in the future, the information in the PSR indicates that he continues to own stakes in several different companies. *See* PSR ¶ 97-105, including a company known as supplies.com. Although the precise nature of supplies.com is unclear, what is clear is that the defendant has not yet filed taxes related to any income he received from the business. *Id*. at ¶ 102. The defendant clearly possesses a strong work ethic. But his ethics when it comes to financial reporting and compliance with the law is a reason for concern. Unlike

some other cases before this Court, the government submits that specific deterrence is an important factor for the Court to consider. A sentence of incarceration will not only cause other vendors who provide supplies to government agencies to think before giving in to a request for a "gift," it will serve as a deterrence for the defendant going forward.

### 3. The History and Circumstances of Defendant

Finally, King's history and characteristics do not excuse his behavior or provide a basis to depart from the revised Guidelines range. The portrait of the defendant laid out in the PSR is of a man who had a spiritual and loving upbringing, which is far different than many other individuals who are sentenced by this Court. Nor was King's conduct a momentary lapse in judgment. To the contrary, King paid bribe after bribe after bribe. In fact, as King admitted at trial, and as his text messages with Bailey showed, he paid bribes on a monthly basis to Bailey and Garnett. Sometimes, he met up with Garnett in parking lots. Sometimes, he left cash in Bailey's mailbox. But no matter how he delivered the cash, he knew he was breaking the law every single time. He also knew that the bribes he paid allowed him to afford a million-dollar house with a gym and movie theatre, a second house, several vehicles, and lavish trips across the world.

### C.     Restitution and Forfeiture

King's criminal conduct is governed by the Mandatory Victims Restitution Act, 18 U.S.C. §3663A ("MVRA"), and accordingly, the Court must impose restitution. As part of his plea agreement, King agreed that the loss he caused to the D.C. government as a result of the bribes he paid to Keys, Mitchell, Garnett, and Bailey, was at least $250,000. Given the difficulties in determining a precise loss amount, the government submits that $250,000 is a reasonable figure for restitution. With respect to forfeiture, the plea agreement specified that King would forfeit $61,250, the minimum amount of profit King received from the offense. The government has

attached a Consent Order of Forfeiture to this Sentencing Memorandum that the parties will execute and provide to the Court prior to the Sentencing Hearing.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, the Government respectfully submits that a sentence of 18 months of incarceration, followed by 36 months of supervised release, is a just and appropriate sentence.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:    /s/*Christopher R. Howland*
       Christopher R. Howland
       Assistant United States Attorney
       Fraud, Public Corruption, & Civil Rights
       D.C. Bar No. 1016866
       601 D Street, N.W.,
       Washington, D.C. 20530
       202-252-7106
       Christopher.Howland@usdoj.gov